

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-16-2006

# Emerson Elec Sup Co v. Estes Express Lines

Precedential or Non-Precedential: Precedential

Docket No. 05-2654

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Emerson Elec Sup Co v. Estes Express Lines" (2006). *2006 Decisions.* Paper 793.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/793

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-2654

EMERSON ELECTRIC SUPPLY COMPANY

v.

ESTES EXPRESS LINES CORPORATION,

<u>Appellant</u>

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 03-cv-00885)
District Judge: Hon. Joy F. Conti

Argued March 31, 2006

BEFORE: SMITH and  COWEN, <u>Circuit Judges</u>,
and ACKERMAN\*, <u>District Judge</u>

(Filed June 16, 2006)

\*Honorable Harold A. Ackerman, Senior United States District
Judge for the District of New Jersey, sitting by designation.

Lawrence J. Roberts, Esq. (Argued)
249 Catalonia Avenue
Coral Gables, FL 33134

Counsel for Appellant

William A. Gray, Esq.
Dennis J. Kusturiss, Esq. (Argued)
Vuono & Gray
2310 Grant Building
Pittsburgh, PA 15219

Counsel for Appellee

_____

OPINION

_____

COWEN, Circuit Judge.

Estes Express Lines Corporation ("Estes") appeals the order of the district court granting summary judgment in favor of Emerson Electrical Supply Co. ("Emerson") requiring Estes to pay for the full value of damaged electrical equipment it transported pursuant to the Carmack Amendment, 49 U.S.C. § 14706. The district court held that the recent legislative changes to the Carmack Amendment did not eliminate the requirement that a carrier such as Estes provide a shipper with a fair opportunity to choose between two or more different rates with corresponding levels of liability. The court concluded that Estes could not limit its liability pursuant to its tariff because it failed to provide Emerson two or more different rates. We will affirm.

**I.**

Emerson is a distributor and seller of electrical equipment produced by various manufacturers, including OEM, Inc. ("OEM"). Electrical Component Sales, Inc. ("ECS") is a distributor for OEM and provides technical and engineering

services to Emerson's customers. Estes is a licensed and authorized motor carrier that transports goods in interstate commerce.

Emerson received a purchase order from Sharon Tube Company for electrical equipment manufactured by OEM. The total price of the equipment was $158,360.00. The shipping arrangements were made by Keith Rypczyk, an employee of ECS. Rypcyzk called Estes to request a quotation for transporting the equipment. Rypcyzk informed Estes that the shipment would consist of four pieces of electrical switch gears, and he provided the approximate dimensions and weight of each piece. Estes sent Rypczyk a fax quoting a shipping price of $450. Estes did not inform Rypcyzk of other shipping rates with corresponding levels of liability if the equipment were to be damaged in transit.[1]

Pursuant to Rypcyk's instructions, Estes picked up the electrical equipment from OEM. The shipment consisted of four uncrated, shrink-wrapped pallets and two packages of lifting angles. OEM produced and signed a bill of lading that stated the shipper agreed to the terms and conditions set forth in the tariff governing the shipment. Pursuant to the bill of lading, the classification of the shipment was class 77.5. The bill of lading contained a declared value section that provided:

> NOTE: Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property. The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding $ ____ per ____.

(A2 173-74 ¶ 12.) OEM left the declared value spaces blank.

---

[1] Estes did inform Rypcyzk that the "LTL" rate might apply if the shipper did not reference the quotation number Estes provided. The record does not explain what the LTL rate is and whether it would affect Estes's level of liability.

After OEM signed the bill of lading, Estes's driver affixed a pro sticker on the bill of lading that stated: "Driver's signature acknowledges receipt of freight only. Terms of EXLA-105 Rules Tariff apply." (A2 173 ¶ 8.) With respect to uncrated, new equipment, Tariff EXLA-105 provided:

> If the shipper fails or declines to release the value of the property to a value not exceeding 10 cents per pound, or designates a value exceeding 10 cents per pound, shipment will not be accepted, but if a shipment is inadvertently accepted, it will be considered as being released to a value of 10 cents per pound and the shipment will move subject to such limitations of liability.

(A2 199.) If the goods were crated, the tariff provided that class 77.5 shipments were limited to a maximum value of $7.90 per pound.

The electrical equipment was damaged during shipment. On January 13, 2003, Emerson filed a cargo claim with Estes for $140,000.00. In response to the cargo claim, Estes sent a letter to Emerson stating that its liability was limited to ten cents per pound, or $1,020.00, based on Estes's Tariff EXLA 105-H.

Emerson then commenced an action in the district court to recover the full amount of the damaged shipment pursuant to the Carmack Amendment, 49 U.S.C. § 14706. Estes moved for partial summary judgment to limit its liability to $1,020.00 pursuant to the tariff limitations. Emerson filed a cross motion for summary judgment contending that the equipment was in good condition when the equipment was given to Estes for transport, and Estes did not effectively limit its liability by offering alternative valuations at different rates.

On June 29, 2004, the district court denied Estes's motion for partial summary judgment to limit liability. The district court held that the legislative changes to the Carmack Amendment did not alter the requirement that a carrier offer a shipper two or more levels of liability. It also found that Estes failed to offer

4

Emerson two or more rates with corresponding levels of liability. The district court denied Emerson's motion for summary judgment without prejudice stating that it failed to offer any evidence that the goods were given to Estes in good condition.

On August 26, 2004, Emerson filed a second motion for summary judgment contending that the equipment was in good condition. The district court granted the motion and entered a judgment against Estes and in favor of Emerson for $145,192.80.

## II.

The district court had jurisdiction under 28 U.S.C. § 1331, and we exercise appellate review pursuant to 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary. See Gilles v. Davis, 427 F.3d 197, 203 (3d Cir. 2005).

The first issue we will consider is whether recent legislative changes to the Carmack Amendment permit a carrier to limit its liability for damaged goods without offering the shipper two or more rates with corresponding levels of liability. To address this issue, we delve into release value agreements under the common law, legislative changes made to the Carmack Amendment, and courts' interpretations of the Carmack Amendment.

### Release Value Agreements Under the Common Law

At common law, a carrier's liability for goods damaged in transit was virtually unlimited.[2] Nor was a carrier permitted to exculpate itself from liability for its negligent acts. See First Pa. Bank, N.A. v. E. Airlines, Inc., 731 F.2d 1113, 1116 (3d Cir.

---

[2] A carrier was liable to the shipper for the full extent of damage to the goods it transported unless the damage was caused by an act of God, a public enemy, the shipper, public authority, or the inherent vice or nature of the goods themselves. See Missouri Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137 (1964).

1984).  It could, however, limit its liability for damaged or lost goods pursuant to a release value agreement.  See id.  Under a release value agreement, a carrier and shipper agreed to a reduced value of the goods in exchange for a reduced shipping rate.  See Union Pac. R.R. v. Burke, 255 U.S. 317, 321 (1921).  Courts would enforce these release value agreements as long as the carrier gave the shipper the alternative of paying a higher rate in exchange for greater carrier liability.  See id.  If a carrier failed to provide the shipper with a reasonable opportunity to pay a higher shipping rate in exchange for greater carrier liability, then the carrier would be liable for the actual true value of the damaged or lost property.  See First Pa. Bank, N.A., 731 F.2d at 1117.

In 1887, Congress passed the Interstate Commerce Act to regulate transportation.  Congress established the Interstate Commerce Commission ("ICC"), an independent regulatory agency, to administer the act.  S. REP. No. 104-176, at 2 (1995).  The ICC initially regulated the railroad industry by requiring rates to be "reasonable and just" and prohibited certain railroad practices, such as rate discrimination, price fixing, and rebating.  Id.  Congress gradually expanded the authority of the ICC by allowing it to regulate other modes of transportation, including the truck and bus industries.  Id. at 2-3.

Initially, the Interstate Commerce Act did not contain a provision concerning the liability of carriers for loss or damage to goods.  It was also silent on whether carriers could exempt themselves from liability or limit their liability pursuant to an agreement in the bill of lading or elsewhere.  3 SAUL SORKIN, GOODS IN TRANSIT §13.02, at 13-16.1 (2005).

In 1906, Congress addressed carrier liability in the Carmack Amendment, which provided in pertinent part:

> That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful

6

holder thereof for any loss, damage, or injury to such property caused by it . . . and no contract, receipt, rule or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed.

Act of June 29, 1906, ch. 3591, § 7, 34 Stat. 593 (1906).

In Adams Express Co. v. Croninger, 226 U.S. 491 (1913), the United States Supreme Court considered whether the Carmack Amendment prohibited a carrier from limiting its liability by providing a choice of freight rates and corresponding levels of liability in its bill of lading. In Croninger, a diamond ring was lost during shipment. The limitation of liability provision in the bill of lading provided that the carrier would not be held liable for more than fifty dollars unless a greater value was declared. The Court interpreted the Carmack Amendment as a codification of the common law and held that a carrier and shipper were still permitted to enter release value agreements. See id. at 508-12; see also Peyton v. Ry. Express Agency, 316 U.S. 350, 351 (1942) (noting that the Supreme Court upheld the power of a carrier to enter into release value agreements following the Carmack Amendment).

Overview of Legislative Changes to the Carmack Amendment

After the Supreme Court's decision in Croninger, Congress passed the first Cummins Amendment, 38 Stat. 1196 (1915), which prohibited all released rate arrangements except when the goods were concealed by packaging and the character of the goods was unknown to the carrier. See Shippers Nat'l Freight Claim Council, Inc. v. I.C.C., 712 F.2d 740, 748 n.6 (3d Cir. 1983). Finding the first Cummins Amendment too restrictive, Congress passed the second Cummins Amendment, 39 Stat. 441 (1916), which substantially restored the common law rule expressed in Croninger. See Peyton, 316 U.S. at 352. Pursuant to the second Cummins Amendment, a carrier could be authorized "by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in

7

writing by the shipper or agreed upon in writing as the released value of the property." Howe v. Allied Van Lines, Inc., 622 F.2d 1147, 1149 (3d Cir. 1980) (quoting previous version of the Carmack Amendment, 49 U.S.C. § 20(11)).[3] The ICC would

------

[3] After the passage of the Cummins Amendments, the Carmack Amendment, 49 U.S.C. § 20(11), provided in pertinent part:

> Any common carrier * * * subject to the provisions of this chapter receiving property for transportation from a point in one State * * * to a point in another State * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it * * * and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier * * * from the liability hereby imposed; and any such common carrier * * * shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it * * * , notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void: * * * Provided, however, That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply * * * to property * * * received for

8

authorize such rates listed in the carrier's tariff if it found the rates to be just and reasonable. See 3 SORKIN § 13.02[1], at 13-19.

In 1978, Congress passed the Revised Interstate Commerce Act, Pub. L. No. 95-473, 92 Stat. 1337 (1978), which recodified the Carmack Amendment. The expressed legislative intent was to restore without substantive change the applicable laws enacted prior to May 16, 1978. See id. The provisions concerning released rates originally found in 49 U.S.C. § 20(11) were codified at 49 U.S.C. § 10730. See Shippers Nat'l Freight Claim Council, Inc., 712 F.2d at 742 n.2. Similar to § 20(11), § 10730 provided:

> The Interstate Commerce Commission may require or authorize a carrier providing transportation or service subject to its jurisdiction . . . to establish rates for transportation of property under which the

---

> transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, and shall not, so far as relates to values, be held to be a violation of section 10 of this chapter; and any tariff schedule which may be filed with the commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared and agreed upon.

Caten v. Salt City Movers & Storage Co., 149 F.2d 428, 431 (2d Cir. 1945) (citing the version of the Carmack Amendment after Congress passed the Cummins Amendments).

liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 10730 (1979). This provision applied to all interstate common carriers of property, other than water carriers. See Shippers Nat'l Freight Claim Council, Inc., 712 F.2d at 742.

Congress then amended § 10730 with the Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793 (July 1, 1980). Section 12 of the Motor Carrier Act divided § 10730 into two subsections. Subsection (a) consisted of the prior § 10730 but was made inapplicable to motor carriers of nonhousehold property. The new subsection (b) allowed a motor carrier of nonhousehold property to establish released rates without prior approval of the ICC, but permitted the ICC to require the carrier to have in effect full liability rates as well.[4] See id.

---

[4] Section 10730, as amended by the Motor Carrier Act of 1980, provided:

(a) The Interstate Commerce Commission may require or authorize a carrier (including a motor common carrier of household goods but excluding any other motor common carrier of property and excluding any rail carrier) providing transportation or service subject to its jurisdiction . . . to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation . . . .

(b)(1) Subject to the provisions of paragraph (2) of this subsection, a motor common carrier providing transportation or service subject to the jurisdiction of

10

the Commission . . . may, subject to the provisions of this chapter (including, with respect to a motor carrier, the general tariff requirements of section 10762 of this title), establish rates for the transportation of property (other than household goods) under which the liability of the carrier . . . for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier and . . . shipper if that value would be reasonable under the circumstances surrounding the transportation.

(2) Before a carrier . . . may establish a rate for any service under paragraph (1) of this subsection, the Commission may require such carrier . . . to have in effect and keep in effect . . . a rate for such service which does not limit the liability of the carrier . . . .

Shippers Nat'l Freight Claim Council, Inc., 712 F.2d at 743 (quoting former version of Carmack Amendment, 49 U.S.C. § 10730).

Section 10762 provided in relevant part:

General tariff requirements

(a)(1) A carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title (except a motor common carrier) shall publish and file with the Commission tariffs containing the rates and (A) if a common carrier, classifications, rules, and practices related to those rates, and (B) if a contract carrier, rules and practices related to those rates, established under this chapter for transportation or service it may provide under this subtitle.

Comsource Indep. Food Serv. Co. v. Union Pac. R.R., 102 F.3d

11

In enacting subsection (b), Congress sought to deregulate transportation services and allow released value rates to foster more competition in prices. H.R. REP. No. 96-1069, at 26 (1980), as reprinted in 1980 U.S.C.C.A.N. 2283, 2308; S. REP. No. 104-176, at 10 (1995).

Congress then passed the Trucking Industry Regulatory Reform Act of 1994, ("TIRRA"), Pub. L. No. 103-311, 108 Stat. 1673, 1684-85, which eliminated the requirement that nonhousehold good carriers file a tariff containing rates with the ICC. Next, Congress passed the ICC Termination Act of 1995 ("ICCTA") which replaced § 10730 with § 14706. Under the ICCTA, motor carriers and freight forwarders can establish rates for the transportation of property, other than household goods, under which the liability of the carrier is limited to a value established by written or electronic declaration of the shipper or by written agreement. As to motor carriers, the rate must be reasonable. The Surface Transportation Board, which replaced the ICC, is authorized to determine reasonableness. 3 SORKIN § 13.02[3], at 13-20.2-13-21.

Federal Courts' Interpretation of the Carmack Amendment

In Carmana Designs Ltd. v. North American Van Lines, Inc., 943 F.2d 316 (3d Cir. 1991), this Court noted that a carrier's ability to "limit [its] liability is a carefully defined exception to the Carmack Amendment's general objective of imposing full liability for the loss of shipped goods; courts, thus, carefully scrutinize agreements purporting to limit such liability." Id. at 319. Prior to the enactment of the TIRRA and the ICCTA, a carrier had to satisfy four requirements before it could limit its liability under the Carmack Amendment:

(1) maintain a tariff within the prescribed

---

438, 443 n.10 (9th Cir. 1996) (quoting previous section of Interstate Commerce Act, 49 U.S.C. § 10762).

guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to [the shipper's] choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment.

Carmana Designs Ltd., 943 F.2d at 319; Am. Cyanamid Co. v. New Penn Motor Express, Inc., 979 F.2d 310, 313 (3d Cir. 1992); accord Hughes Aircraft Co. v. North Am. Van Lines, Inc., 970 F.2d 609, 611-12 (9th Cir. 1992); Norton v. Jim Phillips Horse Transp., Inc., 901 F.2d 821, 827 (10th Cir. 1989); Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415 (7th Cir. 1987). The carrier had the burden of establishing these requirements. See Carmana Designs Ltd., 943 F.2d at 319.

In the present case, Estes contends that the third requirement that a carrier offer a shipper two or more levels of liability is no longer mandated pursuant to the ICCTA. Prior to the ICCTA, the liability limiting provisions under § 10730 of the Carmack Amendment provided in pertinent part:

(b)(1) [A] motor common carrier . . . may . . . establish rates for the transportation of property . . . under which the liability of the carrier . . . for such property is limited to a value established by written declaration of the shipper or by written agreement between the carrier and . . . shipper if that value would be reasonable under the circumstances surrounding the transportation.

(2) Before a carrier . . . may establish a rate for any service under paragraph (1) of this subsection, the Commission may require such carrier . . . to have in effect and keep in effect . . . a rate for such service which does not limit the liability of the carrier . . . .

49 U.S.C. § 10730(b).

Subsequent to the ICCTA, the liability limiting provisions of the Carmack Amendment now state:

> (c) Special rules.--
>
> (1) Motor carriers.--
>
> (A) Shipper waiver.--Subject to the provisions of subparagraph (B), a carrier providing transportation or service . . . may, subject to the provisions of this chapter (including with respect to a motor carrier, the requirements of section 13710(a)), establish rates for the transportation of property (other than household goods described in section 13102(10)(A)) under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.
>
> (B) Carrier notification.--If the motor carrier is not required to file its tariff with the Board, it shall provide under section 13710(a)(1) to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based. The copy provided by the carrier shall clearly state the dates of applicability of the rate, classification, rules, or practices.

49 U.S.C. § 14706.[5]

---

[5] Section 13710(a)(1) provides:

Additional billing and collecting practices
(a) Miscellaneous provisions

Estes contends that 49 U.S.C. § 10730(b)(2) codified the release value doctrine, and the ICCTA's deletion of § 10730(b)(2) indicates Congress's intent to no longer require carriers to offer two or more levels of liability. We disagree with Estes's argument. Congress is presumed to know the federal courts' interpretation of a statute that it intends to amend. See Ankenbrandt v. Richards, 504 U.S. 689, 700 (1992). "[C]ourts presume that Congress will use clear language if it intends to alter an established understanding about what a law means; if Congress fails to do so, courts presume that the new statute has the same effect as the previous version." Firstar Bank, N.A. v. Faul, 253 F.3d 982, 988 (7th Cir. 2001) (citing Cottage Savs. Ass'n v. Comissioner, 499 U.S. 554, 562 (1991)). As noted above, carriers have consistently been permitted to limit their liability subsequent to the second Cummins Amendment through a written declaration of the shipper or by a written agreement between the shipper and carrier. In addition to the statutory requirement of a written agreement between the carrier and shipper, federal courts have required a carrier to offer a shipper two or more rates with corresponding levels of liability in order for a limitation of liability provision to be enforceable. Consistent with prior versions of the Carmack Amendment, the ICCTA permits a carrier to limit its liability through a shipper's written declaration or a written agreement. The ICCTA does not contain clear language altering the courts' additional requirement that a carrier offer two or more rates with two or more levels of liability. At most, the deletion of §10730(b)(2) indicates

---

> (1) Information relating to basis of rate.--A motor carrier of property (other than a motor carrier providing transportation in noncontiguous domestic trade) shall provide to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices, upon which any rate applicable to its shipment or agreed to between the shipper and carrier is based.

49 U.S.C. § 13710.

15

Congress's intent to deregulate the motor carrier industry and to abolish the ICC.

Moreover, the ICCTA's legislative history does not reveal a congressional intent to alter the two or more levels of liability requirement. Because the ICCTA and its legislative history do not express an intent to alter the two or more levels of liability requirement, we hold that a carrier must continue to offer two or more rates with corresponding levels of liability in order to successfully limit its liability pursuant to the Carmack Amendment.[6]

Further buttressing our holding is the decision by the Court of Appeals for the Eleventh Circuit in Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc., 331 F.3d 834, 841 (11th Cir. 2003). In Sassy Doll, the Eleventh Circuit considered whether the TIRRA and ICCTA altered the requirement that a carrier provide a shipper with a reasonable opportunity to choose between two or more levels of liability. The Eleventh Circuit stated:

> The statutory language concerning liability "limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper," 49 U.S.C. 14706(c)(1)(A), is identical in all material respects

---

[6] We also note that the four-prong test in Carmana Designs Ltd. has been altered pursuant to the TIRRA and the ICCTA. As to the first prong, the Surface Transportation Board ("STB") replaced the ICC. Tariffs need only be filed with the STB in certain circumstances for the transportation of property in non-contiguous trade and household goods. See 49 U.S.C. § 13702(a). For carriers that are not required to file tariffs, they must still "provide to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices, upon which any rate . . . is based." 49 U.S.C. § 13710(a). The requirements under the second and fourth prongs continue to exist.

in the current and previous versions of the Carmack Amendment. . . . Notwithstanding the amendments to the Carmack Amendment, a carrier wishing to limit its liability is still required to give the shipper a reasonable opportunity to choose between different levels of liability.

Id. at 841-42.

Declared Value Box

In the alternative, Estes contends that the presence of a declared value box in the bill of lading satisfied the two or more levels of liability requirement. We disagree. In cases where the presence of a declared value box satisfied the carrier's obligation to offer two or more levels of liability, the tariff provided the shipper an option to declare a higher value with a corresponding level of liability. See, e.g., Nat'l Small Shipments Traffic Conference, Inc. v. United States, 887 F.2d 443, 444 (3d Cir. 1989) (noting that shipper will be insured at lowest rate permitted in tariff if shipper leaves declared value box blank when tariff provided shipper an option to declare a higher value); Hollingsworth & Vose Co. v. A-P-A Transp. Corp., 158 F.3d 617, 619 (1st Cir. 1998) (noting that carrier provided shipper with two or more levels of liability because tariff provided for a maximum liability of 10 cents per pound "unless the shipper declare[d] otherwise"). Estes's tariff limited its liability to ten cents per pound regardless of whether the shipper declared a higher value or left the declared value box blank in the bill of lading. Because the tariff did not provide an option to declare a higher value with a corresponding level of liability, Estes failed to meet the two or more levels of liability requirement.

Different Levels of Liability for Different Types of Packaging

Estes finally argues that it offered two or more levels of liability because different limitations of liability were offered depending on how the shipment was packaged. Estes asserts that an uncrated shipment had a .10 per pound limitation of liability

17

while a crated shipment designated as a class 77.5 had a $7.90 per pound limitation of liability. We are not persuaded. To satisfy the two or more levels of liability requirement, a carrier must offer two or more shipping rates with corresponding levels of liability for one type of shipment. See New York, New Haven & Hartford R.R. v. Nothangle, 346 U.S. 128, 134 (1953) ("[O]nly by granting its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge can a carrier lawfully limit recovery to an amount less than the actual loss sustained."); Union Pac. R.R. v. Burke, 255 U.S. 317, 323 (1921) (refusing to uphold carrier's limitation of liability provision because carrier failed to offer shipper two or more rates with corresponding levels of liability). Estes failed to establish that it provided a choice of rates for uncrated goods with corresponding levels of liability.

## III.

For the foregoing reasons, the judgment of the District Court entered on April 1, 2005, will be affirmed.

18