## MIDAMERICAN ENERGY COMPANY, Plaintiff,

### v.

## START ENTERPRISES, INC. d/b/a American Moving Services, Inc., Defendant.

### No. 4:06–cv–00220.

United States District Court,
S.D. Iowa,
Central Division.

Feb. 14, 2008.

---

Gregory R. Brown, Duncan Green Brown Langeness & Eckley PC, Des Moines, IA, for Plaintiff.

Stephen E. Doohen, Whitfield & Eddy, PLC, Des Moines, IA, for Defendant.

## ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ROBERT W. PRATT, Chief Judge.

Before the Court is Defendant, Start Enterprises, Inc. d/b/a American Moving Services, Inc.'s ("Start") Motion for Partial Summary Judgment, filed November 1, 2007. Clerk's No. 21. Plaintiff, MidAmerican Energy Company ("MidAmerican"), filed a resistance on November 21, 2007. Clerk's No. 24. Start filed a reply on November 29, 2007. Clerk's No. 26. Start has requested oral argument on this matter, however, the Court finds that such

argument would not materially aid the resolution of this case. Accordingly, the matter is fully submitted.

## I. FACTS

For the most part, the parties do not dispute the facts of this case.[1] MidAmerican is an Iowa corporation with its principal place of business in Des Moines, Iowa. Def.'s Statement of Material Facts ¶ 1. Start is engaged in the business of moving and storage services, with its principal place of business in Des Moines, Iowa. *Id.* ¶ 2. It appears that Start had some history performing moving and storage services for MidAmerican. Specifically, Start performed approximately 1,090 moves for MidAmerican between 1997 and 2005. *Id.* ¶ 27. In 2003, MidAmerican sent out a notice to prospective service providers entitled, "INSTRUCTION AND INFORMATION TO PROSPERS—Moving of Furniture and Equipment and Storage from September 15, 2003 to September 15, 2005." *Id.* ¶ 4. In response to the notice, Start submitted its Schedule of Rates to MidAmerican, which also indicated that Start "provides liability coverage at a rate of $.60 per pound per item at no additional cost. Additional coverage may be purchased upon request." *Id.* ¶¶ 6, 7. Based on Start's schedule of rates, MidAmerican entered into a Professional Services Contract with Start, valid from September 15, 2003 through September 15, 2005. Def.'s App. at 13–20.

It appears that Start provided moving and storage services to MidAmerican without incident until June 27, 2005. On June 27, 2005, Start performed a move for MidAmerican. Pl.'s Statement of Additional Material Facts ¶ 1. The move required Start to transport MidAmerican's computer equipment, an EMC Clariion CX700 storage array ("storage array"),[2] from

---

**1.** Unless otherwise noted, the facts stated herein are uncontested.

**2.** It appears that a storage array is a computer subsystem which houses a group of disks

Bellevue, Nebraska to MidAmerican's Sioux City, Iowa facility. *Id.* ¶¶ 1, 2. Based on the specification sheets for each individual component part contained in the storage array, it is estimated that the storage array weighs approximately 1,227 pounds.[3] Def.'s Statement of Material Facts ¶ 33. This move was part of MidAmerican's equipment relocation project. Pl.'s Statement of Additional Material Facts ¶ 3. On that day, while two Start employees were in the process of moving the storage array out of the building at Bellevue, they lost control of the storage array. *See* Pl.'s App. at 12. Specifically, Nick Bartlett ("Bartlett"), a crew leader, was handling the dolly with the storage array when he realized that the storage array was rolling off the dolly because the strap had come loose. *Id.* at 10, 12. Apparently, because the weight of the storage array was not evenly balanced on the dolly, the storage array started to tip to one side. *Id.* at 12. Bartlett explained that the storage array "twisted off the side of the dolly [and] rolled off the side of it." *Id.* Although Bartlett tried to get a hold of the rolling storage array, he was unable to do so, and he fell to the floor with it. *Id.* Ultimately, the storage array fell on top of Bartlett's legs. *Id.* Surprisingly, except for being "a little bit sore at that time," Bartlett was not injured as a result of the incident. *Id.*

Later that day, Start employees delivered the storage array to MidAmerican's Sioux City facility. Craig Vogel ("Vogel"), MidAmerican's Supervisor of Data Center Processing met the two movers upon their arrival. *Id.* at 7; Def.'s App. at 47. The movers took the storage array upstairs to the data center. Pl.'s App. at 7. Vogel testified that during the thirty to forty minutes that the movers were with him, they did not inform him of the incident that occurred at Bellevue. *Id.* At some point during the delivery, one of the movers asked Vogel to sign the June 27, 2005 Bill of Lading ("Bill of Lading"). In the course of his employment with MidAmerican, Vogel has signed bill of lading forms and other similar documents to accept shipments on behalf of MidAmerican. Def.'s Statement of Material Facts ¶¶ 15, 19. In this instance, Vogel signed the Bill of Lading without reading it. *Id.* ¶ 16. Additionally, Vogel signed for both the point of origination (Bellevue) and the point of arrival (Sioux City). *See id.* Vogel testified that he signed for both locations because the mover told him to do so. Def.'s App. at 50.

The front page of the Bill of Lading provides:

**CUSTOMER'S DECLARED VALUE AND LIMIT OF COMPANY'S LIABILITY**

Since rates are based on the declared value of the property, and the customer (Shipper) is required to declare in writing the released value of the property, the agreed or declared value of the property is hereby specifically stated to be not exceeding *.60* cents[4] per pound per article for transportation purposes.

Def.'s App. Ex. H. The reverse side of the Bill of Lading provides:

**Sec. 3.  LIABILITY OF THE COMPANY:**

. . .

(e) Unless a greater valuation is stated herein, the depositor or owner declares

---

or tapes, together controlled by software usually housed within the subsystem.

**3.**  The storage array, however, has not been weighed on a scale. Pl.'s Response to Def.'s Statement of Material Facts ¶ 33.

**4.**  The .60 cents notation was already typed in by Start.

that the value in case of loss or damage arising out of storage, transportation, packing, unpacking ... or handling of the goods and the liability of the company for any claim for which it may be liable for each or any piece or package and the contents thereof does not exceed, and is limited to, that amount per lb. designated on the front of this contract, or, if no amount is designated, to 60 cents per lb. per article for the entire contents of the storage lot, upon which declared or agreed value the rates are based, the depositor or owner having been given the opportunity to declare a higher valuation without limitation in case of loss or damage from any cause which would make the company liable and pay the higher rate based thereon, and in no event shall the company be liable except for its own negligence.

Def.'s App. 27.

Vogel received a carbon copy of the Bill of Lading after he signed it. Def.'s Statement of Material Facts ¶ 20. Approximately two to three hours after the movers left, Vogel received a telephone call from Robert Metcalf ("Metcalf"), MidAmerican's Director, Technology Management. Def.'s App. at 49; Pl.'s App. at 1. At that time, Metcalf informed Vogel about the incident at the Bellevue location and instructed Vogel to isolate the storage array and not to power it until he received further instructions. Def.'s App. at 49. At some point, MidAmerican hired Pomeroy IT Solutions to test the storage array. See Pl.'s App. at 5. Upon testing, MidAmerican discovered variability in the test results and felt that it could not trust the storage array with its corporate data. Id. Moreover, EMC, the manufacturer of the storage array at issue, would no longer certify the storage array for warranty or maintenance purposes. Id. Based on the test results and warranty concerns, MidAmerican feared that the storage array was no longer reliable to maintain its corporate data. Id.; Def.'s

Supp.App. at 3. Accordingly, MidAmerican initiated this lawsuit seeking to recover the damage caused to the storage array.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy...." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not " 'to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time

for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### III. LAW AND ANALYSIS

The Carmack Amendment to the Interstate Commerce Act subjects motor carriers, like Start, to absolute liability for "actual loss or injury to property" when transporting cargo in interstate commerce. 49 U.S.C. § 14706(a)(1). The Carmack Amendment provides:

> A carrier providing transportation or service ... shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier ... [is] liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by [the carrier].

49 U.S.C. § 14706(a)(1). A carrier can, however, limit its liability. Specifically,

> [A] carrier providing transportation or service ... may ... establish rates for the transportation of property ... under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 14706(c)(1)(A).

Prior to the enactment of the Trucking Industry Regulatory Reform Act of 1994

("TIRRA"),[5] and the ICC Termination Act of 1995 ("ICCTA"),[6] federal courts consistently held that to limit its liability under the Carmack Amendment, a carrier must: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to [the shipper's] choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment. *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir.1987). *See, e.g., Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 186 (3d Cir.2006) (cases cited therein). The TIRRA and the ICCTA, however, only altered the first prong of the *Hughes* test. *See, e.g., Emerson Elec. Supply Co.*, 451 F.3d at 187 n. 6; *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 841–42 (11th Cir.2003). That is, the Surface Transportation Board ("STB") replaced the ICC, and now tariffs need only be filed with the STB in certain circumstances for the transportation of property in non-contiguous trade and household goods. *Emerson Elec. Supply Co.*, 451 F.3d at 187 n. 6. Thus, post-TIRRA and post-ICCTA, courts continue to adhere to the *Hughes* test to determine if a carrier has limited its liability. Moreover, in applying the *Hughes* test, the Court is mindful that "Congress expressed a public policy against limitation of liability by carriers ... [and that] absolute prohibition ... was softened ever so slightly ... [to admit] a narrow exception[,]" and like any exception to public policy, "the one

wrought by the Carmack Amendment must be construed narrowly." *Rohner Gehrig Co., Inc. v. Tri–State Motor Transit,* 950 F.2d 1079, 1083 (5th Cir.1992).

■ Here, without conceding liability in the first instance, Start argues that it satisfied the *Hughes* test and properly limited its liability to $ .60 per pound pursuant to the Bill of Lading. The first prong is not contested, as MidAmerican admits that Start maintained a tariff with the Surface Transportation Board, the Iowa Department of Transportation, and the Household Goods Carrier Bureau. Def.'s Statement of Material Facts ¶ 3; Pl.'s Response to Def.'s Statement of Material Facts ¶ 3. MidAmerican, however, contends that Start did not meet its burden of proving that Start complied with the rest of the remaining requirements, i.e., obtaining MidAmerican's agreement as to choice of liability; giving MidAmerican a reasonable opportunity to choose between two or more levels of liability; and issuing a receipt or bill of lading prior to moving the shipment. As the carrier seeking to limit its liability, Start has the burden of proving that it complied with each of the requirements. *See, e.g., Carmana Designs Ltd. v. N. Am. Van Lines, Inc.*, 943 F.2d 316, 319 (3d Cir.1991).

## A. Did Start Issue a Receipt or a Bill of Lading Prior to Moving the Storage Array?[7]

As noted above, to limit liability under the Carmack Amendment, the fourth prong requires the carrier to prove that it issued a receipt or a bill of lading that

---

5. TIRRA eliminated the requirement that non-household good carriers file a tariff containing rates with the Interstate Commerce Commission ("ICC"). *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 185 (3d Cir.2006).

6. ICCTA replaced former § 10730 with § 14706, and replaced the ICC with the Surface Transportation Board. *Id.* at 185–86.

7. Because MidAmerican's main argument stems from Start's alleged failure to issue a receipt or a bill of lading prior to shipment, the Court will address the fourth prong first.

reflects the agreement between the two parties to limit liability. *Gallo v. Bekins A–1 Movers, Inc.*, No. 2:05–cv–00866, 2007 WL 817622, at *4 (D.Nev. Mar. 14, 2007). The bill of lading, moreover, must be issued prior to shipment. *See, e.g., Hughes*, 829 F.2d at 1421 (stating that "carrier *must* ... provide the shipper with a receipt or bill of lading *before* transporting his goods") (emphasis added). Start points to the Bill of Lading signed at the point of origination and the point of destination to demonstrate that Start satisfied this prong. The inquiry here, however, is whether Start issued the Bill of Lading prior to shipment, not whether the Bill of Lading was ultimately signed for both locations after delivery. Indeed, Vogel's undisputed testimony shows that he signed for both locations after the storage array was delivered to Sioux City. Def.'s App. at 50.

There is nothing in the record to demonstrate that Start issued the Bill of Lading prior to shipment, nor does Start claim that it issued the Bill of Lading prior to shipment. Rather, Start focuses on the fact that the Bill of Lading was signed for after delivery. That, however, does not satisfy Start's burden of proving that it complied with the requirement that it issue a receipt or a bill of lading prior to shipment. Based on Bartlett's deposition testimony, it appears that a MidAmerican agent was present at Bellevue for the pickup of the storage array. *See* Pl.'s App. at 11. It is unclear from the record, however, whether this MidAmerican agent was provided with the Bill of Lading and failed to sign it, or whether Start failed to provide the Bill of Lading to MidAmerican's agent altogether. Regardless, based on

the record, Start did not prove that it complied with the requirement that the Bill of Lading be issued to MidAmerican prior to shipment. Accordingly, at this stage on summary judgment, the Court cannot conclude as a matter of law that Start satisfied the fourth prong of the test—that Start provided a receipt or the Bill of Lading prior to shipment.[8]

## B. *Did Start Obtain MidAmerican's Agreement as to MidAmerican's Choice of Liability?*

■ At this stage in summary judgment, in making all inferences in favor of MidAmerican, if Start failed to issue the Bill of Lading prior to shipment, such action, or rather inaction, would also affect the second prong of the *Hughes* test, whether Start obtained MidAmerican's agreement as to MidAmerican's choice of liability. As noted above, if the MidAmerican agent at the Bellevue location was not provided with the Bill of Lading to read, sign, or otherwise, it would be difficult for Start to argue that there was agreement to limit liability prior to shipment. A shipper can choose to limit a carrier's liability without signing a bill of lading. *Acro Automation Sys., Inc. v. Iscont Shipping Ltd.*, 706 F.Supp. 413, 417 (D.Md.1989). For instance, "[r]eceipt of the writing by the shipper and his action upon it are adequate proof that he has assented to its terms and has made it the written agreement of the shipper and carrier." *Id.* (quoting *Caten v. Salt City Movers & Storage Co.*, 149 F.2d 428, 432 (2d Cir.1945)). Thus, "when a writing that is the basis of the agreement limiting liability is assented to by conduct, the conduct, if unambigu-

8. Start also proffers the argument that during the course of years in which Start performed moves for MidAmerican, there were occasions where signatures were not immediately collected on the bill of lading forms. Such a contention is without merit. As noted above, the inquiry here is whether Start issued a receipt or a bill of lading prior to shipment, a requirement that Start must satisfy to limit its liability under the Carmack Amendment.

ous, will serve the same function a[s] a signature." *Id.*

 However, "an agreement limiting liability in the absence of a signature would require delivery of the written agreement *before* performance of the contract of carriage so that the shipper's action on it in proceeding with the shipment reveals his assent to the terms of the agreement." *Id.* (citing *Am. Ry. Express Co. v. Lindenburg,* 260 U.S. 584, 591, 43 S.Ct. 206, 67 L.Ed. 414 (1923)). In this case, there is no indication of assent by conduct prior to shipment. As for Vogel, he accepted the Bill of Lading after delivery, and after the storage array had been allegedly damaged. At that point, there was no action that could be taken upon the Bill of Lading because, by the time Vogel received the Bill of Lading, Start's performance had been completed. *Id.* Vogel's acceptance of the Bill of Lading upon delivery "only acknowledged receipt of delivery, not acceptance of the terms of the contract of carriage." *Id.* Accordingly, based on the record before the Court, the Court cannot conclude as a matter of law that Start satisfied the second prong of the of the test—that Start obtained MidAmerican's agreement as to MidAmerican's choice of liability.[9]

## IV. CONCLUSION

For the reasons stated above, Start's Motion for Partial Summary Judgment (Clerk's No. 21) is DENIED.

IT IS SO ORDERED.

---

9. Because Start was not able, as a matter of law, to satisfy the fourth and the second prong of the *Hughes* test, the Court need not address the third prong, whether Start provided MidAmerican a reasonable opportunity to choose between two or more levels of liability.