**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 05a0519n.06**
**Filed: June 17, 2005**

**No. 04-3151**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| GLENN HUNTER & ASSOCIATES, INC., | ) | |
| | ) | **ON APPEAL** FROM THE |
| **Plaintiff-Appellee,** | ) | UNITED STATES DISTRICT |
| | ) | C O U R T   F O R   T H E |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| UNION PACIFIC RAILROAD CO., | ) | |
| | ) | **O P I N I O N** |
| **Defendant-Appellant,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NORFOLK SOUTHERN CORP., | ) | |
| | | |
| **Defendant.** | | |

**BEFORE: NORRIS, BATCHELDER, Circuit Judges; MILLS, District Judge.**[*]

**ALAN E. NORRIS, Circuit Judge.** Plaintiff Glenn Hunter & Associates, Inc. ("Hunter"),

filed suit against Union Pacific Railroad Company and Norfolk Southern Corporation after 100 tons

of refractory brick disappeared from a railroad car hauled at various times by the defendants. After

a bench trial, the court entered judgment in favor of Hunter and assessed damages in the amount of

$131,000, plus interest, against defendant Union Pacific. On appeal, Union Pacific designates two

assignments of error: 1) the district court erred when it applied a two-year, rather than one-year,

---

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

statute of limitations; and 2) the award of damages was overly speculative.  Although we adopt a reasoning different from that employed by the district court, we nonetheless affirm its judgment.

**I.**

Hunter, an Ohio corporation, acquires used refractory brick from glass furnaces that have been demolished and then resells it.  This suit arose in January 2000 when Hunter arranged  to haul scrap brick from a demolition project at a factory owned by Ball-Foster Container Company of Seattle.  The agreement called for Ball-Foster to pay Hunter $50 per ton of material removed; Hunter would then issue a $25 rebate to Ball-Foster for each ton of a special brick that it recovered.  As a typical part of such agreements, Hunter arranges for hauling away the scrap brick and provides the customer with a certificate of recycling, thereby allowing a company to avoid the expense of disposing of a potentially hazardous material.

The exchange at issue here involved two kinds of brick: ordinary silica brick and aluminum zirconium silicate refractory (AZS) brick.  AZS brick is a high-density brick used extensively in glass furnaces.  Hunter has but one customer for AZS brick: Heinz Schenzler GmbH. & Co., a German company.  Pursuant to a written agreement, Heinz Schenzler has a standing order to purchase all of the AZS brick generated by Hunter for $1,500.00 per metric ton.  Hunter frequently relies upon railroads to transport the brick it recovers to its facility in Liberty Center, Ohio.  Maumee & Western Railroad ("Maumee") services the tracks at Hunter's facility and its employee, Phillip Randall, makes arrangements with other railroads, such as defendants, to ship the material to a point in Ohio where it is received by Maumee.  In this particular case, he negotiated a rate of $4,039 per railcar and communicated that information to Hunter's general manager Phil Ray so that Ray could

submit a bid to Ball-Foster for the project at issue. At the request of Hunter, Randall informed

Union Pacific that its proposed rate should be "published" and, as a result, it issued a rate quote

designated UPCQ 80152.000, which it faxed to Randall on December 7, 1999.

Among other services, Randall provided Johnelle Witzler, the office manager for Hunter,

with sample bills of lading that included routing and rate information. Witzler admitted that Randall

did this because "otherwise I wouldn't have known what to put on it for the routing or any other

information."

The bill of lading at issue in this case contains a reference, which Randall included on the

sample that he sent to Witzler, to "Rate Authority: UPCQ 80152.000 eff. 11-29-99." UPCQ

80152.000 in turn notes that it is "subject to the provisions of Rules Circular UP 6600-Series." The

Rules Circular in question contains the following provision, which is a bone of contention in this

case:

> All lawsuits must be filed within one (1) year of receipt of the first written notice
> from Railroad rejecting a claim, either in full or in part. Any rejection of a claim
> shall start the time period for filing a lawsuit, notwithstanding the fact that the
> rejection letter notifies the claimant of omissions in the claim and the necessary
> actions required to correct the deficiencies.

According to Randall, he never forwarded a copy of UPCQ 80152.000 to Hunter.

In any event, a uniform straight bill of lading signed on January 13, 2000, specifies that three

railcars of brick were released to Union Pacific in Seattle for shipment to Hunter's facility in Liberty

Center, Ohio. Two railcars contained silica brick and glass, while the third contained approximately

106 tons of AZS brick. Although originally hauled by Union Pacific, the three cars were transferred

to the control of Norfolk Southern en route.

The two cars carrying the silica brick and glass arrived in Ohio on February 3 and 20.  The third car, which contained the vast majority of the AZS brick, arrived at the Maumee interchange on February 23; however, the railroad car was empty.  Randall informed Witzler of the situation and followed it up with a letter to Ray.  The letter traced the progress of the car from Seattle and stated, "It appears that since the NS [Norfolk Southern] has had the car on their line for such an extended period of time, it may have been sent to a NS clean out track which would account for it being empty."  Randall then advised Ray to file a claim for material and transportation charges with Norfolk Southern.

Ray filed a "Presentation of Lading Loss and Damage Claim" with the railroad on February 29, 2000.  In a letter dated June 20, Norfolk Southern requested that Hunter provide additional information related to its claim.  On September 19, Norfolk Southern wrote to Ray, conveying the following:

> We have information from the origin rail carrier [Union Pacific], that when the shipment was weighed at Hinkle, NE on January 19, 2000, it was noted that MP 643543 was empty.
>
> In light of this evidence, it is apparent that the subject railcar presumably shipped with product was never loaded, and therefore, we have no alternative than to respectfully maintain disallowance of your claim.

Glenn Hunter responded with a letter to Norfolk Southern on November 14, 2000.  He enclosed a letter from Ball-Foster employee, Ken Towne, who supervised the loading of the railcars.  Hunter also asked for further information from the railroad, including a certified copy of the weight slip relied upon by Norfolk Southern.

Although not entirely clear from the record, it is undisputed that Hunter also filed a claim against Union Pacific for its loss at some point after it had made a demand against Norfolk Southern. Union Pacific disallowed the claim on April 20, 2001.

Hunter filed suit in this case on November 27, 2001.  Union Pacific takes the position that Glenn Hunter's letter of November 14, 2000, to Norfolk Southern reflected the company's awareness that its claim had been denied, at which point the one-year statute of limitations began to run.  Because the suit was filed thirteen days after the one-year period had passed, it fell outside the limitations period imposed by the Rules Circular.

Defendants filed a motion for summary judgment based upon the one-year statute of limitations.  The district court denied the motion based upon this rationale:

> Plaintiff contends that the one year limitations period stated in the Rules Circular is unenforceable because it did not have reasonable notice of the limitations period stated in the Circular.  The bill of lading, plaintiff notes, must, pursuant to 49 C.F.R. § 1035.1, include language specifying that suits are to be filed within two years and one day from the date on which a claim is rejected.
>
> The bill of lading in this case appears to have been one-sided, containing none of the standard language normally found on a uniform bill of lading.  The omission of the required language does not relieve the Union Pacific of its effect, because the applicable regulation requires the inclusion of that language in the bill of lading.
>
> I conclude that the bill of lading must be read as if it included the mandatory language about a two year limitations period.  For the carrier to enjoy the benefit of a shorter period, it should be required to make reasonable efforts to make the shipper aware that a shorter, rather than a longer period described in a bill of lading, controls. Here no such effort was made: nothing called plaintiff's attention to the shorter period being imposed by it via the Rules Circular.

The court also relied upon *Comsource Indep. Foodservice Cos., Inc. v. Union Pacific R.R. Co.*, 102 F.3d 438 (9th Cir. 1996).

Defendants moved for reconsideration.  They conceded that a key issue was whether 49 C.F.R. § 1035.1 applied in this case.  That regulation specifies requirements for bills of lading governed by the Interstate Commerce Act.  The motion explained that legislative changes had rendered the district court's reasoning outdated:

> The Court's ruling in this case presents the unusual but understandable situation in which the Court has inadvertently failed to consider the recent legislative changes to the Interstate Commerce Act which resulted in the deregulation of most rail transportation.  The contract quote and contract rate issued to Hunter for the movement at issue specifically states that the movement will be governed by 49 U.S.C. § 10709, which . . . removes all federal regulation, intervention, jurisdiction, and the Interstate Commerce Act itself from the freight movement transaction.  In addition, the *Comsource* decision itself, based upon operative facts occurring in 1991, has been rendered obsolete by legislative changes.

Motion for Reconsideration, Feb. 4, 2003 at 2-3.

The district court considered these new arguments and rejected them:

> The rationale of *Comsource* is not, in my view, dependent on the statutory and regulatory context in which that case arose.  The rationale is, rather, that the railroad failed to give reasonable notice of the shorter limitations period.  Even if the requirement of 49 C.F.R. § 1035.1 is not applicable, because the terms and conditions of this shipment were set forth in a contract, rather than being controlled by statutory and regulatory provisions applicable to common carriage, I conclude that the defendant failed to give reasonable notice that the Rules Circular, incorporated by reference into the contract via its incorporation by reference of the price quote, contained a shortened limitations period.  As noted in my initial decision, there is no indication that the defendant had provided the plaintiff with a copy of its Rules Circular, or that the plaintiff otherwise was on actual or constructive notice of the provisions of the Rules Circular. . . .
>
> It is one thing to impose the conditions of the price quote on the plaintiff by reference in the parties' contract to those conditions, at least to the extent that they

are set forth in the price quote. It is another to impose conditions from a document (the Rules Circular) that itself is incorporated by reference into a document (the price quote) that has been incorporated by reference. In such circumstances, there must be some basis, in my view, for concluding that the shipper is in fact aware of the contents of the document secondarily incorporated by reference in a document that has been primarily incorporated by reference.

Order, Apr. 16, 2003 at 3-4.

The court conducted a bench trial in August 2003. After submission of post-trial briefs, it issued an order granting judgment to Hunter. Among other things, the court reiterated its view that a two-year statute of limitations applied. The court also reached the following conclusions:

o      "No one knows what happened to the brick along the way, though the record shows that the car had weighed empty before being accepted by NS for its portion of the trip. I find that it is more likely than not that the brick was lost while in UP's possession and control."

o      "Hunter's employee included the reference to the price quote in the bill of lading pursuant to instructions from Randall. Randall, in turn, had obtained that information from UP. Randall did not know the contents of the cross-referenced price quote, that it incorporated the Rules Circular, or what the contents [of] the Rules Circular were."

o      Hunter's lost profits of $131,000 were not remote or speculative. "Hunter established its regular course of dealing with its sole customer for all the AZS brick that it could obtain. Other brick was sold at the rate on which Hunter bases its computation of lost profits within the same general period. That sets a most reasonable measure of the value of Hunter's loss."

Order, Jan. 4, 2004 at 2, 4, 6. The district court entered judgment in the amount of $131,000 plus interest from April 20, 2001, the date on which Union Pacific rejected Hunter's claim.

**II.**

*1. The Appropriate Statute of Limitations*

There appears to have been some confusion below about which statutory provision governs the contract at issue. On December 29, 1995, the Interstate Commerce Commission Termination Act ("the Act"), Pub.L. 104-88, was enacted. Among other things, the Act abolished the Interstate Commerce Commission and amended Title 49 "to minimize the need for Federal regulatory control over the rail transportation system" with the objective "to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers." 49 U.S.C. § 10101(2) & (4). The Act included a statutory section, codified at 49 U.S.C. § 10709, that permits the following:

> One or more rail carriers providing transportation subject to the jurisdiction of the Board under this part may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions.

49 U.S.C. § 10709(a). In short, if they choose to do so, parties can enter into contracts for interstate shipments that are free of oversight by the Surface Transportation Board ("the Board"). 49 U.S.C. § 10709(c)(1). In that case, "[t]he exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court." 49 U.S.C. § 10709(c)(2).

Neither party now disputes that the contract at issue here is governed by § 10709. However, the district court took the two-year statute of limitation from another provision of the Interstate Commerce Act, 49 U.S.C. § 11706, which applies to those agreements subject to the oversight of the Board:

> A rail carrier may not provide by . . . contract . . . a period of . . . less than 2 years for bringing a civil action against it under this section. The period for bringing a civil

> action is computed from the date the carrier gives a person written notice that the carrier has disallowed any part of the claim specified in the notice.

49 U.S.C. § 11706(e).  The reliance on this section by the district court is understandable, given that the complaint explicitly relied upon 49 U.S.C. § 11706 and 28 U.S.C. § 1337 for jurisdiction.[1]

Hunter prepared the bill of lading at issue and included reference to UPCQ 80152.000 as the rate authority.  Had it not done so, then the freight would have moved in common carriage and been subject to those rates and tariffs.  However, UPCQ 80152.000 expressly states, "This <u>CONTRACT</u> is made pursuant to 49 U.S.C. § 10709 and shall become binding on the parties upon acceptance by the shipper named above.  Shipper may accept this <u>CONTRACT</u> either by written notice, or by tender of traffic under its terms."  By electing to proceed under 49 U.S.C. § 10709 Hunter received the benefit of lower shipping rates, but also knew, or should have known, that 49 U.S.C. § 11706, with its distinct set of rights and remedies, did not apply.

> Ohio law permits parties to negotiate for a shorter statute of limitations:

> The statute of limitations for an action upon a written contract is fifteen years. *See* R.C. 2305.06. We are also aware, and are in agreement with, the principle . . . that, "[g]enerally, in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, as between the parties, the time for bringing an action on such contract to a period less than that prescribed in a general statute of limitations provided that the shorter period shall be a reasonable one."

*Miller v. Progressive Cas. Ins. Co.*, 69 Ohio St. 3d 619, 624, 635 N.E.2d 317, 321 (1994) (striking down shortened limitations period in automotive insurance policies as against public policy but recognizing general principle in dictum) (citation omitted). Furthermore, a contracting party must

---

[1] In response to an Order from this Court, Hunter has filed an amended complaint that premises jurisdiction on diversity of citizenship.

make "a reasonable effort to know its contents [and] cannot, in the absence of fraud or mutual mistake, avoid the effect of the contract." *Pippen v. M.A. Hauser Enter., Inc.*, 111 Ohio App. 3d 557, 564, 676 N.E.2d 932, 937 (Ohio. App. 1996) (citations omitted).

Turning to Hunter's allegation that it remained ignorant of the contents of UPCQ 80152.000 and the Rules Circular, we note that a contracting party has an affirmative duty to familiarize itself with the terms and conditions contained in other documents incorporated by reference. For instance, in *Haskins v. Prudential Ins. Co. of America*, 230 F.3d 231 (6th Cir. 2000) (overruled on other grounds by *Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646 (6th Cir. 2003) (en banc)), this court considered whether an arbitration agreement that required an employee to arbitrate his Title VII claim was valid even though it incorporated provisions in the National Association of Securities Dealers Code that had not been explicitly communicated to the employee. We concluded that the arbitration provision was enforceable:

> [W]e adopt the standard . . . that absent a showing of fraud, duress, mistake, or some other ground upon which a contract may be voided, a court must enforce a contractual agreement to arbitrate.
>
> . . . .
>
> . . . The court is not prepared to abandon the long-standing principles of contract law, such as:
>
>> [O]ne who accepts a written contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party. Thus, ignorance of the contents of a contract expressed in a written instrument does not ordinarily affect the liability of one who signs it or who accepts it otherwise than by signing it.

17A Am.Jur.2d Contracts § 224 (1991).

*Haskins*, 230 F.3d at 239.  Under the logic of *Haskins*, Hunter had an affirmative duty to familiarize itself with the terms of UPCQ 80152.000 and Rules Circular UP 6600-B.  There was no testimony during trial that Hunter requested a copy of either document even though it prepared the bill of lading incorporating them.  Under these circumstances, Hunter was bound by the one-year statute of limitations contained in the Rules Circular.

That said, even under a one-year limitations period, Hunter's complaint was timely filed. The Rules Circular provides that "All lawsuits must be filed within one (1) year of receipt of the first written notice from Railroad rejecting the claim, either in full or in part." In turn, the Rules Circular refers to "railroad" as the "railroad or railroads party to the Agreement."

While Norfolk Southern is referred to in the bill of lading as a carrier,[2] only Union Pacific was party to the bill of lading: it published UPCQ 80152.000 and drafted the Rules Circular at issue. We do not accept Union Pacific's contention that the term "railroad" is defined by the following provision of the Rules Circular:

**ITEM 35 - TRANSPORTATION OBLIGATION**

The railroad or railroads party to the Agreement (subsequently referred to as Railroad) will provide linehaul transportation in accordance with the terms and conditions of the Agreement.

Not only does this language appear in a separate section of the Circular, it makes no reference to a limitations period.  At best the definition of "Railroad" as used in the section of the Circular that defines the statute of limitations is ambiguous.  Because we must construe ambiguities in a contract against the drafting party, *McKay Mach. Co. v. Rodman*, 11 Ohio St. 2d 77, 80, 228 N.E.2d 304, 307

---

[2] Under the heading "Routing," appears "UP Chicago NS," referring to Union Pacific and Norfolk Southern respectively.

(1967), we read the contested provision in a manner most favorable to Hunter.  In this case, the term

"railroad" can be read to refer only to the railroad that is party to the contract or bill of lading.

Under that interpretation, the statute of limitations began to run on April 20, 2001, when Union

Pacific rejected Hunter's damages claim.  The complaint, which was filed the following November,

therefore fell well within the one-year window imposed by the Circular.

## 2.  Damages Award

The standard for recovering lost profits is as follows:

> Lost profits may be recovered by the plaintiff in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty.

*Charles R. Tombs Trucking, Inc. v. Int'l Harvester Co.*, 12 Ohio St. 3d 241, 466 N.E.2d 883, 885

(1984) (syllabus).

The district court provided the following basis for its award of damages:

> Hunter established its regular course of dealing with its sole customer for all the AZS brick that it could obtain.  Other brick was sold at the rate on which Hunter bases its computation of lost profits within the same general period.  That sets a most reasonable measure of the value of Hunter's loss.

Order, Jan. 5, 2004 at 6.  We detect no error in this reasoning, which is supported by the evidence

introduced during trial.

### III.

The judgment of the district court is **affirmed**.