

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-18-2009

# Babcock & Wilcox Co v. Kansas City S

Precedential or Non-Precedential: Precedential

Docket No. 08-1080

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Babcock & Wilcox Co v. Kansas City S" (2009). *2009 Decisions.* Paper 1803.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1803

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 08-1080

———————————

THE BABCOCK & WILCOX COMPANY

v.

THE KANSAS CITY SOUTHERN RAILWAY COMPANY;
NORFOLK SOUTHERN RAILWAY COMPANY,
                                        Appellants

———————————

Appeal from the
United States District Court for the
District of New Jersey
(D.C. No. 06-cv-06015)
District Judge: Honorable Dickinson R. Debevoise

———————————

Argued: November 21, 2008

———————————

Before: BARRY and CHAGARES, <u>Circuit Judges</u>, and
RESTANI,[*] <u>Judge</u>

(Opinion Filed: February 18, 2009)


Rodney B. Griffith
Charles L. Howard
Paul D. Keenan (Argued)
Chad D. Mountain
Keenan Cohen & Howard

———————————

[*] Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

165 Township Line Road
One Pitcairn Place, Suite 2400
Jenkintown, Pennsylvania 19046

Counsel for Appellants

Andrew R. Brown (Argued)
Hill Rivkins & Hayden
45 Broadway
Suite 1500
New York, NY 10006

James A. Saville, Jr.
Hill Rivkins & Hayden
175 North Broadway
South Amboy, NJ 08879

Counsel for Appellee

---

OPINION OF THE COURT

---

RESTANI, Judge

Plaintiff-appellee The Babcock & Wilcox Company ("B&W") commenced this action under the Carmack Amendment to the Interstate Commerce Act ("ICA"), 49 U.S.C. § 11706, against defendants-appellants Kansas City Southern Railway Company ("KCSR") and Norfolk Southern Railway Company ("NSR") (collectively "the Railroads") to recover damages to its boiler. The Railroads appeal from an order of the United States District Court for the District of New Jersey denying their motion to dismiss for lack of subject matter jurisdiction and granting B&W's cross-motion for summary judgment. We will vacate the judgment of the District Court and remand the matter with instructions to dismiss for lack of subject matter jurisdiction.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The following facts are undisputed. In October 2004, B&W, a manufacturer of power generation equipment, and KCSR entered into a rail transportation agreement.[1] The agreement provided for the transportation of "steel power boilers, parts or attachments" from West Point, Mississippi to Newark, New Jersey. (Contract 2–3, App. 38–39.) In November 2004, pursuant to the agreement and a bill of lading, the Railroads transported a boiler for B&W. The parties stipulated that the Railroads received the boiler in good order and condition. (Joint Stipulation ¶ 2, App. 41.) In December 2004, NSR became aware that the boiler was damaged, having been allegedly sideswiped by another train at a rail yard while in NSR's care. NSR then notified B&W of the damages.

In May 2006, after NSR denied B&W's damage claim, B&W commenced this action under the Carmack Amendment to the ICA, 49 U.S.C. § 11706[2], against the Railroads to recover

---

[1] Under the agreement, KCSR was to transport the freight from West Point, Mississippi, and NSR was to intercept the freight in Meridian, Mississippi and transport it to Newark, New Jersey. NSR agreed to defend and indemnify KCSR. (Defs.' Br. in Supp. of Mot. to Dismiss the Compl. for Lack of Subject-Matter Jurisdiction ("Defs.' Mot. to Dismiss") 1 n.1, Docket Entry No. 10-3).

[2] Section 11706 provides:

(a) A rail carrier providing transportation or service subject to the jurisdiction of the [Surface Transportation] Board under this part [i.e., 49 U.S.C. §§ 10101–11908] shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by--

3

$42,814.48 in damages. The parties later stipulated that the Railroads' maximum liability under the agreement was $25,000. (Joint Stipulation ¶ 4, App. 41.) The Railroads moved to dismiss the complaint for lack of subject matter jurisdiction. They argued that the agreement was not a common carrier transportation agreement under the ICA but a private contract entered into under 49 U.S.C. § 10709[3]. (Defs.' Mot. to Dismiss 3–5, Docket Entry

(1) the receiving rail carrier [or]
(2) the delivering rail carrier[.]
. . . .
(c)(1) A rail carrier may not limit or be exempt from liability imposed under subsection (a) of this section except as provided in this subsection.
. . . .
(3) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part may establish rates for transportation of property under which–
(A) the liability of the rail carrier for such property is limited to a value established by written declaration of the shipper or by a written agreement between the shipper and the carrier.

49 U.S.C. §§ 11706(a), (c)(1), (c)(3)(A) (2000).

[3] Section 10709 provides:

(a) One or more rail carriers providing transportation subject to the jurisdiction of the [Surface Transportation] Board under this part [i.e., 49 U.S.C. §§ 10101–11908] may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions.
. . . .
(c)(1) A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the

No. 10-3.) The Railroads contended that the only basis for federal jurisdiction would have been diversity jurisdiction under 28 U.S.C. § 1332, which was not satisfied because the damages sought did not meet the $75,000 amount in controversy requirement for such jurisdiction. (*Id*. at 4.) B&W responded that the agreement was not a § 10709 contract because the agreement did not state that it was made pursuant to § 10709. (Pl.'s Mem. in Opp'n to Defs.' Mot to Dismiss & in Supp. of Cross Mot. for Summ. J. 7–10, Docket Entry No. 13.) B&W also cross-moved for summary judgment on its § 11706 claim.

The District Court denied the Railroads' motion to dismiss. The court concluded that it had jurisdiction because "there [was] no evidence suggesting that the parties had any intention of invoking § 10709." *Babcock & Wilcox Co. v. Kansas City S. Ry. Co.*, Civ. No. 06-6015, 2007 WL 4440163, at *2 (D.N.J. Dec. 17, 2007). The court stated that "in order to invoke section 10709, a contract must specifically incorporate the same" but that it found no such incorporation in the agreement. *Id*. at *3. The court rejected the Railroads' argument that the agreement's content evinced the parties' intent to invoke § 10709. *Id*. The court also found no evidence of intent at the time of execution of the agreement to invoke § 10709. *Id*. Exercising jurisdiction, the District Court granted B&W's cross-motion for summary judgment and entered judgment in the amount of $25,000 in favor of B&W. *Id*. at *4. The Railroads now appeal, challenging only the ruling on jurisdiction.

---

grounds that such contract violates a provision of this part.

(2) The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree. This section does not confer original jurisdiction on the district courts of the United States based on section 1331 or 1337 of title 28, United States Code.

49 U.S.C. § 10709(a), (c) (2000).

**JURISDICTION AND STANDARD OF REVIEW**

This Court has jurisdiction to review a final judgment under 28 U.S.C. § 1291. We review the question of whether the District Court had subject matter jurisdiction *de novo*. *Emerald Investors Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 197 (3d Cir. 2007). If we conclude that the District Court lacked subject matter jurisdiction, "we [will] direct it to dismiss the case even at this late stage of the litigation." *Id*.

**DISCUSSION**

The Railroads maintain that the District Court did not have subject matter jurisdiction over this action because the agreement was not a common carrier transportation agreement under the ICA but, rather, a private contract entered into under 49 U.S.C. § 10709. They claim that the District Court erred in concluding that a § 10709 contract must reference the statute and in determining that the agreement's terms do not evince intent to invoke § 10709.

**I. Self-Description Requirement**

Whether § 10709 contracts must be self-described is an open question in this Court. Review of the legislative history of § 10709 and the history of the corresponding federal regulations, however, indicate that the law currently imposes no such requirement.

**A. Legislative and Regulatory History**

In 1887, Congress enacted the ICA to regulate interstate transportation and established the Interstate Commerce Commission ("ICC") to administer the Act. *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 183 (3d Cir. 2006). The ICA initially did not set forth provisions governing carrier liability for loss of or damage to goods being transported. *Id*. In 1906, Congress enacted the Carmack Amendment, which required carriers to issue a receipt or bill of lading for property received for transportation and held carriers liable for any loss, damage, or injury to the property resulting from the transportation thereof in claims arising out of the receipt or bill of lading. *Id*. The purpose of the Carmack Amendment was "'to relieve shippers of the burden

6

of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods.'" *Union Pac. R.R. Co. v. Greentree Transp. Trucking Co.*, 293 F.3d 120, 124 (3rd Cir. 2002) (quoting *Reider v. Thompson*, 339 U.S. 113, 119 (1950)). The provision of the Carmack Amendment governing the liability of rail carriers, 49 U.S.C. § 11706, holds rail carriers liable for "the actual loss or injury to property." 49 U.S.C. § 11706(a). District courts "have original jurisdiction of an action brought under [§ 11706] . . . if the matter in controversy for each receipt or bill of lading exceeds $10,000." 28 U.S.C. § 1337(a) (2000). The amount in controversy here is $25,000.

In 1976 and 1980, the Railroad Revitalization and Regulatory Reform Act and Staggers Rail Act ("Staggers"), respectively, were enacted to deregulate the railroad industry to enable it to compete efficiently in the transportation industry. Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895; Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L .No. 94-210, 90 Stat. 31. Under Staggers, 49 U.S.C. § 10713 (the predecessor to § 10709) enabled shippers and carriers to sidestep federal regulation of transportation agreements by entering into private contracts. Staggers Rail Act of 1980, § 208; H.R. Rep. No. 96-1430, at 100 (1980) (Conf. Rep.), *reprinted in* 1980 U.S.C.C.A.N. 4110, 4132; *see also* 49 U.S.C. § 10713 (1994) (repealed 1996) (current version at 49 U.S.C. § 10709 (2000)). Such private contracts are not governed by the ICA, including § 11706, and the "exclusive remedy" for any actions arising out of such a contract "shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree." 49 U.S.C. § 10713(h)(i)(2) (current version at 49 U.S.C. § 10709(c)(2)). Section 10709 now clarifies that the section "does not confer original jurisdiction on the district courts of the United

States based on [28 U.S.C. §§ 1331[4] or 1337[5]]."  49 U.S.C. § 10709(c)(2).

Predecessor § 10713 required rail carriers to file with the ICC any § 10713 private contract along with a summary of non-confidential contract information.  49 U.S.C. § 10713(b).  Section 10713 granted the ICC authority to determine the essential terms to be made available to the public.  *Id.*  The filing requirements were enacted to achieve a balance between protecting the confidentiality of private contracts, making information available to enable parties with standing to exercise their rights to challenge the contracts, and enabling the ICC to exercise its remaining regulatory function of approving or disapproving contracts.  *See generally Burlington N. R.R. Co. v. Pub. Util. Comm'n of Tex.*, 812 F.2d 231, 235–236 (5th Cir. 1987); *Water Transp. Ass'n v. I.C.C.*, 722 F.2d 1025, 1030–32 (2d Cir. 1983).

To implement the filing requirements of § 10713, the ICC promulgated regulations in 49 C.F.R. Part 1039 (1983) (repealed 1987) (current version at 49 C.F.R. Part 1313 (2008)).  Railroad Transportation Contracts, 47 Fed. Reg. 50,261, 50,262–64 (Nov. 5, 1982).  The ICC defined "contract" as follows:

---

[4]  Section 1331 provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331 (2000).

[5]  Section 1337 provides:

The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . : *Provided*, *however*, That the district courts shall have original jurisdiction of an action brought under [49 U.S.C. § 11706] . . . only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs.

28 U.S.C. § 1337(a) (2000).

8

Section 1039.1 Definition of the term "contract."
(a) A contract subject to this section is a written agreement . . . entered into by one or more rail carriers with one or more purchasers of rail services, to provide specified services under specified rates, charges and conditions.
(b) A contract filed under this section shall:
(1) specify that the contract is made pursuant to 49 U.S.C. 10713, and
(2) be signed by duly authorized parties.

*Id*. at 50,262; *see also* 49 C.F.R. § 1039.1 (current version at 49 C.F.R. § 1313.1(c)). The ICC adopted the subsection (b)(1) self-description requirement in response to suggestions by its Office of Special Counsel ("OSC") "to specify which contracts [would] be subject to [49 C.F.R. § 1039]," as "there [were] many different types of contracts specifically referred to in the [ICA] which [were] administered by the [ICC]." *Railroad Transportation Contracts*, 367 I.C.C. 9, 10 (1982). The OSC wanted to clarify that "the scope of the term 'contract' would be limited to those contracts intended to be filed under [49 C.F.R. § 1039]." *Id*. The ICC retained this definition when it moved 49 C.F.R. § 1039.1 to 49 C.F.R. § 1313.1 in 1987. *See Railroad Transportation Contracts*, 51 Fed. Reg. 45,898, 45,899 (interim Dec. 23, 1986); *see also* 49 C.F.R. § 1313.1 (1987) (amended 1993 and 1997).

Thus, in light of the history behind the enactment of predecessor § 10713 and promulgation of corresponding regulations, the regulatory self-description requirement appears to have been created to aid the ICC in administering the filing of private contracts. Supporting this conclusion is the fact that the self-description requirement was deleted from the regulations when Congress eliminated the contract-filing requirement.

In 1992, the ICC eliminated from the regulations the contract-filing requirement for agreements governing transportation of non-agricultural commodities. *Railroad Transportation Contracts*, 8 I.C.C.2d 730, 730–33 (1992). The ICC, however, still required that carriers file contract summaries of non-confidential information. *Id*. at 734. The full filing requirements remained for contracts governing transportation of agricultural commodities, and

the regulations still required that such contracts be self-described. *See id.* at 733, 739; *see also* 49 C.F.R. § 1313.1 (1993) (amended 1997).

In 1995, in deregulating the surface transportation industries, Congress enacted the ICC Termination Act ("ICCTA"), which revised the ICA and eliminated federal regulation of non-agricultural contracts. ICC Termination Act of 1995, Pub. L. No 104-88, 109 Stat. 803; *see also* S. Rep. No. 104-176 (1995). In recodifying § 10713 in new § 10709, Congress eliminated all filing requirements for non-agricultural contracts and required only the filing of contract summaries for agricultural contracts. Railroad Contracts, 61 Fed. Reg. 13,147, 13,147–48 (proposed Mar. 26, 1996) (comparing 49 U.S.C. § 10713(b)(1) (Supp. 1 1994) with 49 U.S.C. § 10709(d)(1) (Supp. 2 1994)). The ICCTA also abolished the ICC and created the Surface Transportation Board ("STB") to administer the ICA. ICC Termination Act of 1995, §§ 101, 201.

Thereafter, the STB revised the regulations to "reflect the reduced regulatory oversight of rail transportation contracts introduced by the [ICCTA]." *Railroad Contracts*, 1 S.T.B. 987, 987 (1996); *see also* Removal of Obsolete Regulations Concerning Railroad Contracts, 61 Fed. Reg. 29,036, 29,036–37 (June 7, 1996). Under revised 49 C.F.R. Part 1313, the STB redefined "contract" as "an agreement, including any amendment thereto, entered into by one or more rail carriers and one or more purchasers of rail services to provide specified transportation of agricultural products . . . under specified rates and conditions." *Railroad Contracts*, 1 S.T.B. at 990; *see also* 49 C.F.R. § 1313.1(c) (1997). This new definition does not contain a self-description requirement. *See* 49 C.F.R. § 1313.1(c). The deletion of this requirement after Congress no longer required carriers to file any full private contracts, whether they governed transportation of agricultural or non-agricultural commodities, further indicates that the self-description requirement was created for the purpose of contract-filing efficiency.

Also supporting the conclusion that self-description is not required is a recent proposal by the STB to adopt a self-description rule. In March 2007, the STB instituted a rulemaking proceeding to adopt an interpretation of "contract" to more easily distinguish

10

between a "common carrier pricing arrangement" and a "rail transportation contract." *Interpretation of the Term "Contract" in 49 U.S.C. 10709*, STB Ex Parte 669, 2007 WL 934379, at \*2–\*4 (STB served Mar. 29, 2007). The rulemaking proceeding was instituted in response to *Kansas City Power & Light Co. v. Union Pacific Railroad Co.* ("*KCPL*"), STB Docket No. 42095, 2007 WL 934378 (STB served Mar. 29, 2007), which concerned an agreement "that appears to have all of the characteristics of a rail transportation contract" but which the carrier labeled as a "common carrier rate." *Id.* at \*3. In *KCPL*, to determine if it had jurisdiction over the proceeding, the STB had to decide whether the agreement provided for a "common carrier rate" or a "contract rate." *KCPL*, 2007 WL 934379, at \*1. The STB exercised jurisdiction despite the unclear nature of the agreement because it thought the parties could have reasonably relied on prior agency precedent to conclude that the agreement was subject to the STB's jurisdiction. *Id.* at \*3. The STB, however, instituted a rulemaking proceeding to clarify the distinction between a common carrier agreement and private contract. *Id.* at \*4. In the proceeding, the STB proposed to define "contract" under § 10709 as

> any bilateral agreement between a carrier and a shipper for rail transportation in which the railroad agrees to a specific rate for a specific period of time in exchange for consideration from the shipper, such as a commitment to tender a specific amount of freight during a specific period or to make specific investments in rail facilities.

*Interpretation of the Term "Contract" in 49 U.S.C. 10709*, 2007 WL 934379, at \*4; *see also* Interpretation of the Term "Contract" in 49 U.S.C. 10709, 72 Fed. Reg. 16,316, 16,318 (proposed Apr. 4, 2007). Objections of shippers and carriers led the STB to discontinue the proceeding, however. *Interpretation of the Term "Contract" in 49 U.S.C. 10709*, STB Ex Parte No. 676, 2008 WL 657934, at \*2–\*3 (STB served Mar. 12, 2008).

Nonetheless, still "concerned with the lack of any clear demarcation between common carriage rates and contract pricing arrangements and the resulting ambiguity regarding the [STB]'s jurisdiction," the STB instituted a subsequent rulemaking

11

proceeding "to consider imposing a requirement that each carrier provide a full disclosure statement when it seeks to enter into a rail transportation contract under section 10709." *Id.* at \*3; *see also* Rail Transportation Contracts Under 49 U.S.C. 10709, 73 Fed. Reg. 13,523, 13,523 (proposed Mar. 13, 2008). According to the STB, such a disclosure statement "would explicitly advise the shipper that the carrier intends the document to be a rail transportation contract, and that any transportation under the document would not be subject to regulation by the [STB]." *Interpretation of the Term "Contract" in 49 U.S.C. 10709*, 2008 WL 657934, at \*3; *see also* Rail Transportation Contracts Under 49 U.S.C. 10709, 73 Fed. Reg. at 13,523. In January 2009, after reviewing public comments on the proposal, the STB proposed to add the following provision to 49 C.F.R. Part 1301:

> §1301.1 Contract Disclosure Statement.
> (a) The Board will not find jurisdiction over a dispute involving the rate or service under a rail transportation agreement where that agreement contains a disclosure statement that conforms with paragraphs (b) and (c) of this section. Conversely, where a rail transportation agreement fails to contain such a disclosure statement, the Board will find jurisdiction over a dispute involving the rate or service provided under that agreement, absent clear and convincing evidence both that the parties intended to enter into a rail transportation contract governed by 49 U.S.C. 10709 and that the shipper was made aware that it could request service under a common carrier tariff rate that would be subject to STB jurisdiction.
> (b) The disclosure statement should appear at the top of the first page of the rail transportation agreement in type size at least as large as the type size used for the body of the agreement.
> (c) The disclosure statement should read as follows: Disclosure Statement – This agreement constitutes a rail transportation contract under 49 U.S.C. 10709. Contract arrangements are generally not subject to challenge before the Surface Transportation Board ("STB"), but can be enforced in a court of competent

12

jurisdiction. Under federal rules found at 49 CFR 1300, railroads are required, upon request, to quote to shippers a rate for common carriage transportation (i.e., a non-contract rate). Pursuant to 49 U.S.C. 10701, the STB has jurisdiction (subject to some exceptions) over disputes arising out of common carriage (non-contract) rates.

*Rail Transportation Contracts Under 49 U.S.C. 10709*, STB Ex Parte No. 676, 2008 WL 5451432, at \*7 (STB served Jan. 6, 2009); *see also* Rail Transportation Contracts Under 49 U.S.C. 10709, 74 Fed. Reg. 416, 419 (proposed Jan. 6, 2009). The proposed rule, if adopted, would apply prospectively. *Rail Transportation Contracts Under 49 U.S.C. 10709*, 2008 WL 5451432, at \*5; *see also* Rail Transportation Contracts Under 49 U.S.C. 10709, 74 Fed. Reg. at 418. The proposal to promulgate such a rule confirms that there is currently no self-description requirement.

## B. Recent Case Law

Despite the legislative history of § 10709, the District Court placed considerable reliance on *Schoenmann Produce Co. v. Burlington Northern & Santa Fe Railway Co.*, 420 F. Supp. 2d 757 (S.D. Tex. 2006), in concluding that § 10709 contracts must cite the statute. The District Court interpreted *Schoenmann* as holding that "in order to invoke section 10709, a contract must specifically incorporate the same." *Babcock*, 2007 WL 4440163, at \*3.

*Schoenmann* analyzes the interplay of 49 U.S.C. §§ 10709, 11706, and 10502[6], an issue that is not before us and one that we

---

[6] In addition to enacting predecessor § 10713 in Staggers, Congress also granted the ICC authority to exempt "a person, class of persons, or a transaction or service" from federal regulation. Staggers Act of 1980, § 213; *see also* 49 U.S.C. § 10502 (2000) (formerly 49 U.S.C. § 10505). Section 10502 states:

(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the [STB] under this part, the [STB], to the maximum extent

need not address. The issue there was whether an action that was

> consistent with this part, shall exempt a person, class of persons, or a transaction or service whenever the [STB] finds that the application in whole or in part of a provision of this part--
> (1) is not necessary to carry out the transportation policy of section 10101 of this title; and
> (2) either--
> (A) the transaction or service is of limited scope; or
> (B) the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power.
>  . . . .
> (e) No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 11706 of this title. Nothing in this subsection or section 11706 of this title shall prevent rail carriers from offering alternative terms nor give the [STB] the authority to require any specific level of rates or services based upon the provisions of section 11706 of this title.

49 U.S.C. § 10502(a), (e).

Courts have interpreted § 10502(e) to mean that although carriers of § 10502-exempt shipments are subject to full liability under § 11706, the carriers may limit their liability without violating § 11706 as long as they still offer shippers the option of full § 11706 liability. *See*, *e.g.*, *Rexroth Hydraudyne B.V. v. Ocean World Lines*, 547 F.3d 351, 360 n.15 (2d Cir. 2006) ("[U]nder the Staggers Act, certain 'exempt' rail carriers may limit their liability under Carmack by negotiating 'alternative terms,' so long as the shipper is presented with the option of selecting 'full Carmack coverage, which includes both the Carmack version of strict liability and full coverage for loss.'") (citing *Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co.*, 456 F.3d 54, 59–60 (2d Cir. 2006)); *Tokio Marine & Fire Ins. Co. v. Amato Motors, Inc.*, 996 F.2d 874, 878–79 (7th Cir. 1993). The shipment at issue here is not exempt under § 10502.

initiated to recover damages to § 10502-exempt shipments that were subjected to a limited liability provision should be brought under § 11706 or § 10709. *See* 420 F. Supp. 2d at 758–59. The plaintiff shipper, which initiated suit in state court, argued that the action should be brought under § 10709. *Id.* at 759. The defendant railroads, which removed the action to federal court, argued that the action should have been brought under § 11706. *Id.* at 758–59. The district court held that § 11706 governed. *Id.* at 762. The court first determined that § 10709 did not apply to § 10502 shipments because § 10502 shipments were exempt from Subtitle IV of Title 49 of the ICA, which included § 10709. *Id.* at 761. The court also determined that § 10709 did not govern because none of the shipping documents referenced § 10709. *Id.* The court reasoned:

> Contracts entered into under section 10709 specifically cite the statute. *See*, *e.g.*, *Glenn Hunter & Assocs., Inc. v. Union Pacific R.R. Co.*, No. 04-3151, 135 Fed.Appx. 849, 854 (6th Cir. June 17, 2005) (unpublished opinion) ("This CONTRACT is made pursuant to 49 U.S.C. § 10709"); *Tamini Trasformatori S.R.L. v. Union Pacific R.R.*, No. 02-129, 2003 WL 135722, at *7 (S.D.N.Y. Jan.17, 2003) (unpublished opinion) (holding that contract was not a section 10709 contract, even though it contained a statement that it was entered pursuant to section 10709, because it failed to offer full Carmack liability as an option); [*Am. Rock Salt Co. v. Norfolk S. Corp.*, 387 F. Supp. 2d 197, 201 (W.D.N.Y. 2005)] (holding that Carmack Amendment applied even though the contract stated that it was "made pursuant to 49 U.S.C. § 10709" because other provisions in the contract provided for its application); *cf. PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 541 (5th Cir. 2005) (citing STB decision that contracts were governed by section 10709 when "[e]ach contract affirmatively stated that it was made pursuant to § 10709, identified the origins and destinations, and specified the terms of the contract and the rates for the commodities.")

15

*Id.* The court also relied on the ICC decision and former regulation implementing predecessor § 10713 that stated that agreements made under § 10713 "'must specifically state that it is subject to this section.'" *Id.* (quoting *Railroad Transportation Contracts*, 367 I.C.C. at 10; 49 C.F.R. §1039.1(b)(2)). The court then held that an action to recover damages to the § 10502-exempt shipments was brought under § 11706, despite a limitation on liability. *Id.* at 762.

The District Court's reliance on *Schoenmann* for the proposition that § 10709 contracts must cite the provision is problematic. First, *Schoenmann* merely noted that contracts in other cases have referred to the statute, but the fact that other parties incorporate the statute into their agreements does not mean that such a requirement exists.[7] Further, none of these referenced cases hold that § 10709 contracts must cite the provision. Second, *Schoenmann* found guidance in an obsolete ICC decision and regulation. As we observed, § 10713 and the corresponding regulations were repealed, and the STB deleted the self-description requirement from the regulations, years before *Schoenmann* was decided.

We conclude based on the relevant legislative and regulatory history that the failure of the agreement at issue to cite § 10709 is not fatal to the Railroads' claim that the agreement is a § 10709 contract. Thus, we turn to other indicia of intent.

## II. Intent to Invoke § 10709

In New Jersey, courts will determine the intent of contracting parties from the contractual language, if that is possible. *See Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 347 (N.J. 2006) ("The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety[.]") (quoting *Atl. N. Airlines, Inc. v.*

---

[7] B&W contends that NSR itself had also referenced § 10709 in its contracts at issue in other cases. The agreement here, however, was "[i]ssued [b]y" KCSR. (Contract 1, App. 37.) Thus, NSR's contracting history is not relevant.

*Schwimmer*, 96 A.2d 652, 656 (N.J. 1953)).

The agreement at issue, labeled "CONFIDENTIAL RAIL TRANSPORTATION CONTRACT," provided for the transportation of "STEEL POWER BOILERS, PARTS OR ATTACHMENTS" from West Point, Mississippi to Newark, New Jersey via route "KCS-MERID-NS" and was effective from October 12, 2004 through September 30, 2005. (Contract 2–3, App. 38–39.) The "General Shipment Conditions" were as follows:

> Price is subject to cancellation on 30 day(s) notice;
> Price is subject to maximum liability of $25,000 per VESSEL;
> Price is not subject to Rule 29 of UFC;
> Price is not subject to Rule 24 of UFC;
> Price is subject to UFC tariff 0000006000;
> Price is subject to KCS tariff 0000009011;
> Price is subject to KCS tariff 0000000010;
> Quote number must be specified on the bill of lading;
> Price is subject to fuel surcharge[.]

(*Id.* at 2, App. 38.) The agreement also provided for additional shipment conditions:

> Charges for Special Train Movement are not included in the price[;]
> Price applies in Flat cars[;]
> Charges for Heavy Duty Flat Car Charge are not included in the price;
> Price is subject to RPS tariff 0000006740;
> Price applies in equipment with mechanical designation Code FM.

(*Id.* at 3, App. 39.) The "General Rate and Minimum Qualifiers" were as follows:

> Rate application is per hundred (of basic unit).
> Rate applies on minimum weight of 179,000 pounds.

(*Id.* at 2, App. 38.)

The Railroads claim that, according to its terms, the agreement encompassed all the attributes of a "contract" under the plain language of § 10709, specifically that it was "(i) an agreement to provide specified services, (ii) to which one or more interstate rail carriers are parties and (iii) to which one or more purchasers of rail services are parties, (iv) under specified rates and (v) under specified conditions." (Appellants' Br. 13–14.) In particular, the Railroads contend that the contract was "between KCSR, an interstate railroad, and B&W, a purchaser of rail services; . . . for the specific service of rail transportation of 'Steel Power Boilers, Parts or Attachments' from West Point, MS to Newark, NJ via the route of 'KSC-MERID-NS;' and . . . for a specific confidential rate." (Appellants' Br. 5–6.) The Railroads further assert that the specified conditions in the agreement deviate from the statutory obligations that the ICA imposes on rail carriers under 49 U.S.C. § 11101. They claim that such deviation also evinces the parties' intent to enter into a § 10709 contract. We agree with the Railroads on each of these points.

Section 11101 sets forth the statutory obligations of rail carriers concerning provision of services and publication of common carrier rates and service terms. 49 U.S.C. § 11101 (2000). Under § 11101, rail carriers must provide service and their rates and service terms to the public upon request. *Id.* § 11101(a), (b). The carriers may not increase their rates or change their service terms unless they have provided 20 days written notice to those who have requested the rates or terms or those who have made shipping arrangements that would be affected by the increased rates or changed terms. *Id.* § 11101(c). The carriers must provide transportation or service in accordance with the rates and service terms as published or made available under § 11101. *Id.* § 11101(e). Section 11101 directs the STB to implement the section by establishing corresponding regulations to "provide for immediate disclosure and dissemination of rates and service terms, including classifications, rules, and practices, and their effective dates." *Id.* § 11101(f); *see also* 49 C.F.R. pt 1300 (2008). Except for 49 C.F.R. § 1300.1, which defines the scope of the rules, the regulations parallel the statutory requirements. *See* 49 C.F.R. pt. 1300. Title 49 C.F.R. § 1300.1 states that the regulations "do not

18

apply to any transportation or service provided by a rail carrier under a contract authorized under 49 U.S.C. 10709 or former 49 U.S.C. 10713." 49 C.F.R. § 1300.1(c).

Although § 11101 requires rail carriers to provide service and rates for the service to the public upon request, the agreement at issue here contains a single rate specific to B&W. B&W does not dispute the Railroads' contention that this rate is "neither published nor available to the public." (Appellants' Br. 12.) Although § 11101 permits rail carriers to change their service terms upon 20 days notice, under the agreement, the service terms here were effective from October 12, 2004 through September 30, 2005, with "[p]rice . . . subject to cancellation on 30 day(s) notice." (Contract 2, App. 38.) Further, the agreement is self-labeled a "confidential railroad transportation contract," which applies to only "steel power boilers, parts or attachments," limits liability to $25,000.00 per vessel, and applies to a minimum weight of 179,000 pounds. (*Id.*) These specific terms and conditions deviate from the common carrier obligations imposed by the ICA and evince intent to enter into a § 10709 contract. *See Siemens Power Transmission & Distribution, Inc. v. Union Pac. R.R. Co.*, No. H-03-0298, 2005 WL 2647977, at *1 (S.D. Tex. Oct. 17, 2005) (finding § 10709 contract where certain provisions in bills of lading "explicitly deviate[d] from the requirements of the Carmack Amendment"); *Tokio Marine & Fire Ins. Co. v. Mitsui O.S.K. Lines, Ltd.*, No. CV 02-3617 ER, 2003 WL 23181013, at *1 (C.D. Cal. June 27, 2003) (concluding that agreement was § 10709 contract because it was "Exempt Rail Transportation Agreement" and "provide[d] rail transportation pursuant to specified rates and conditions"); *Union Pac. R.R. Co. – Pet. for Declaratory Order*, STB Finance 35021, 2007 WL 1437360, at *2 & n.6 (STB served May 16, 2007) (noting that certain contract terms, such as "fixed rates for a term of 3 years, minimum volume requirements, service commitments, liquidated damages provisions, and force majeure clauses," were "indicia of a rail transportation contract"); *cf. E.I. Dupont de Nemours & Co. v. CSX Transp., Inc.*, STB 42099, 42100, 42101, 2007 WL 4466694, at *5 (STB served Dec. 20, 2007) (concluding that agreement labeled "confidential" not § 10709 contract because it was unclear whether terms were consistent with obligations under § 11101 and which terms were confidential, and because extrinsic evidence showed no intent to

contract for private rates); *Aggregate Volume Rate on Coal, Acco, Utah to Moapa, Nev.*, 364 I.C.C. 678, 687–88 (1981) (concluding that agreement providing "(1) a specific price term; (2) a particularized quantity and term . . . ; and (3) a specified duration" would have been contract but for lack of meeting of the minds). B&W does not show how the contract terms here conform with § 11101 or submit any evidence to negate a finding of intent to enter into a private contract.[8]

B&W relies principally on *Sompo Japan Insurance Co. v. Norfolk Southern Railway Co.*, 540 F. Supp. 2d 486 (S.D.N.Y. 2008), in arguing that based on the totality of the indicia of intent the agreement at issue is not a § 10709 contract. This reliance is

---

[8] Although the parties do not raise any arguments as to the District Court's reasons for rejecting the Railroad's reliance on the agreement's contents, we note that the District Court's rationale appears flawed. The District Court concluded that the Railroads "did not raise any specific material distinctions – such as a change in the liability requirements of regulations promulgated pursuant to § 11706 – which would indicate a preference for section 10709." *Babcock*, 2007 WL 4440163, at *3. The Court noted "the general objective of § 11706 to impose full liability on carriers for the loss of shipped goods, and to regulate the extent to which such liability may be contracted away," and that carriers may limit their liability without violating § 11706 if they meet certain conditions. *Id.* The Court, however, concluded that the Railroads did not assert that any of these conditions existed. *Id.* In so doing, the Court cited *Emerson Electric Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179 (3d Cir. 2006), and *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003), which hold that, in order for a liability limitation to be valid, a carrier must offer shippers two or more levels of liability with corresponding rates. These cases, however, are inapposite because they address whether limits of liability are valid in actions brought under the Carmack Amendment. Whether the Railroads satisfied the requirements to limit liability is irrelevant in determining intent to invoke § 10709. In fact, the contract reflects and the parties stipulated to a $25,000 limit. There was no reason for the Railroads to argue about conditions for liability limitations that they asserted did not apply and on which B&W was not relying.

misplaced.

As did *Schoenmann*, *Sompo* analyzed the interplay of 49 U.S.C. §§ 10709, 11706, and 10502. In *Sompo*, the plaintiff insurance companies sued the defendant railroads to recover damages to cargo made during the domestic (or rail) leg of an overseas shipment from Asia to the State of Georgia. 540 F. Supp. 2d at 488. The issue was whether the defendant rail carriers may limit their liability under the terms of the various agreements in question. *Id.* The district court held that liability was not limited by any of the agreements and that the plaintiffs may therefore recover the full value of the cargo. *Id.* The court concluded that because the shipments were exempt under § 10502, to limit liability the defendants must first offer the shippers the option of § 11706 coverage. *Id.* at 493–94. Finding that no such initial offer was made, the court then analyzed whether the agreements were § 10709 contracts such that liability could still be limited despite the failure to offer the option of full liability. *Id.* at 497. The court declined to so find because there was no "statement as to the statutory authorization for the contracts on their face or . . . evidence of such an understanding between the parties." *Id.* at 497. The *Sompo* court cited the District Court's decision here, *Schoenmann*, and the cases cited therein. *Id.* at 495. Such reliance does not advance B&W's case for the reasons we stated in discussing *Schoenmann* earlier.[9] Furthermore, we have set forth the evidence otherwise indicating intent to enter into a § 10709 contract here.

We note the difficulties faced by the district courts in the

[9] In denying the defendants' motion for reconsideration, however, the *Sompo* court clarified that it "did not go that far" as to hold that § 10709 contracts must affirmatively cite the statute. *Sompo Japan Ins. Co. v. Norfolk S. Ry. Co.* ("*Sompo II*"), 553 F. Supp. 2d 348, 350 (S.D.N.Y. 2008). The court stated that it "merely held that the absence of a reference to § 10709 was one consideration" in determining the existence of a § 10709 contract and that it "relied also on the absence of any indication that there was a meeting of the minds that § 10709 applied." *Id.* at 350–51.

21

absence of a simple statutory or regulatory test for identifying a §
10709 contract. The few courts that have faced the issue seem to
approach it differently. Some courts seem hesitant to disturb prior
law and presume the existence of a common carriage agreement in
the absence of compelling evidence indicating otherwise. *See*, *e.g.*,
*Sompo*, 540 F. Supp. 2d at 497–98 ("Absent (1) a statement as to
the statutory authorization for the contracts on their face or (2)
evidence of such an understanding between the parties, and
because (3) the previous regulations required this statement, (4) the
current regulations do not affirmatively exempt this statement, and
(5) the STB has noted confusion on this issue, there is no basis for
concluding that the ITAs are § 10709 contracts."); *Schoenmann*,
420 F. Supp. 2d at 761 (finding no § 10709 contract because
agreement did not cite § 10709 and because regulation
implementing predecessor § 10713 required contracts to be self-
described); *Gateway, Inc. v. Burlington N. & Santa Fe Ry. Co.*, No.
01 C 9482, 2002 WL 1822919, at *3 (N.D. Ill. Aug. 8, 2002)
(holding § 11706 governed because "there [was] no mention of any
facts that support an inference that the relationship between [the
shipper] and [the carrier] [was] governed by 49 U.S.C. § 10709").
On the other hand, some courts presume the existence of a § 10709
contract. *See*, *e.g.*, *Siemens*, 2005 WL 2647977, at *2 ("Most
shipping agreements, including bills of lading, are now embodied
in [§ 10709] private contracts."); *Consol. Rail Corp. v. Rail Servs.,
Inc.*, No. 5:99-CV-144, 2001 U.S. Dist. LEXIS 190, at *6 (W.D.
Mich. Jan. 4, 2001) (finding § 10709 contract because "[d]efendant
has not pointed to any contractual term that would indicate the
parties' intent to have this private contractual shipping arrangement
be governed by federal law"); *cf. Transit Homes of Am., Div. of
Morgan Drive Away, Inc. v. Homes of Legend, Inc.*, 173 F. Supp.
2d 1192, 1195 (N.D. Ala. 2001) (noting in discussion of analogous
provision of ICA governing shipments by motor carriers that only
very limited types of shipments by motor carriers were subject to
ICA obligations after "legislation [from] the mid-1990's
substantially deregulated the trucking industry," and "[t]herefore,
the great majority of transportation of property by motor carrier in
this country must, of necessity, occur pursuant to the terms of
private contracts of one form or another, be they receipts, bills of
lading, or otherwise, between individual carriers and shippers").

We need not decide the proper default rule to apply in the

22

case of ambiguous provisions, however, because there is ample evidence within the four corners of the agreement at issue here that a § 10709 contract was intended.  B&W largely relies on the mere absence of an express reference to § 10709 in the contract, but the substance of provision after provision indicates just such a contract was intended.

## **CONCLUSION**

The legislative history of § 10709, the history of the corresponding federal regulations, and recent STB proceedings indicate that a contract need not reference § 10709 in order to be § 10709 contract.  The terms of the contract here, which deviate in numerous respects from the common carrier obligations imposed by the ICA, evince the intent of the parties to enter into a § 10709 contract.  Accordingly, we will vacate the judgment of the District Court and remand the matter with instructions to dismiss the action for lack of subject matter jurisdiction.